UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Western Division)

| | | |
|---|---|---|
| HECTOR L. MAYSONET SANTOS,<br>Plaintiff | : | |
| v. | : | C.A. No.<br>JURY TRIAL DEMANDED |
| AMHERST-PELHAM REGIONAL SCHOOL DISTRICT, by and Through the Amherst-Pelham Regional School Committee; MICHAEL MORRIS; DOUGLAS SLAUGHTER; and TALIB SADIQ,<br>Defendants. | : | |

**VERIFIED COMPLAINT**

Plaintiff Hector L. Maysonet Santos hereby commences this first amendment retaliation and discrimination action against his former employer, the Amherst-Pelham Regional School District, and its agents for violations of 42 U.S.C. § 1983; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and Mass. Gen. Laws c. 151B. Plaintiff alleges the following:

**<u>Preliminary Statement</u>**

1. This case is about a public school district that fired a veteran Puerto Rican-American Christian school adjustment counselor because of a private Facebook repost about faith, family, and parenting that he shared on his own time, on his own page, and in his own capacity as a father and a citizen.

2. Before the District fired him, its own Superintendent understood that the repost was protected by the First Amendment and that the District could not fire Santos for it. The District later used that same repost as a ground to terminate him.

3. The District did not act on a fair assessment of the evidence. It acted in the middle of a political firestorm, under intense public pressure, after a student newspaper accused Santos and other Christian counselors of misconduct that the District's own investigator could not substantiate. In the same period, the District removed, investigated, and terminated other employees swept into the same controversy, including a guidance counselor whom an arbitrator later ordered reinstated after finding a vast gulf between the accusations against her and the evidence.

4. Defendants treated Santos's traditional Christian beliefs as disqualifying, treated his English-as-a-second-language pronoun mistakes as terminable misconduct while other employees made the same mistakes without consequence, and used the language of student safety as a pretext to punish protected speech, religion, and national origin.

5. Santos lost his career, his income, and his professional reputation. Prospective employers rescinded offers once they learned of the Amherst events. He brings this action to vindicate his constitutional and statutory rights and to hold Defendants accountable.

## The Parties

6. Plaintiff HECTOR L. MAYSONET SANTOS ("Santos") is an individual, male person of legal age, who, at all times relevant to this action, was employed by the Amherst-Pelham Regional School District as a school adjustment counselor at Amherst Regional Middle School and a resident of Springfield, Massachusetts. Santos is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983, and an "employee" within the meanings of 42 U.S.C. § 2000e(f) and Mass. Gen. Laws c. 151B § 1(6).

7. Defendant AMHERST-PELHAM REGIONAL SCHOOL DISTRICT (the "District") is a body politic established under the laws of the Commonwealth of Massachusetts, whose powers, duties, and liabilities are vested in and exercised by the Amherst-Pelham Regional School Committee (the "School Committee"), and is being sued by and through the School Committee. The District and the School Committee maintain a principal office at 170 Chestnut Street, Amherst, Massachusetts 01002. At all times relevant to this matter, the District managed, maintained, operated, and controlled Amherst Regional Middle School ("ARMS"), where it employed Santos. At all times relevant to this action, the District was an "employer" within the meanings of 42 U.S.C. § 2000e(b) and Mass. Gen. Laws c. 151B § 1(5), and a "person acting under color of law" within the meaning of 42 U.S.C. § 1983.

8. Defendant MICHAEL MORRIS ("Morris") is an individual, male person of legal age, who, from August 2016 to August 2023, was an employee of the District and served as its Superintendent. At all times relevant to this action, Morris exercised control over the terms and conditions of Santos's employment, including the authority to place Santos on administrative leave and to direct the investigation of Santos. At all times relevant to this action, Morris was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, who actively participated in, and stands responsible for the unconstitutional, wrongful, and tortious acts, errors and omissions complained of herein.

9. Defendant DOUGLAS SLAUGHTER ("Slaughter") is an individual, male person of legal age, who, at all times relevant to this action, was an employee of the District and served as its Acting Superintendent from May 2023 to July 2023 and as its Interim Superintendent from September 2023 to June 2024. At all times relevant to this action, Slaughter exercised control over the terms and conditions of Santos's employment and had the authority to approve or concur in Santos's dismissal. At all times relevant to this action, Slaughter was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, who actively participated in, and stands responsible for the unconstitutional, wrongful, and tortious acts, errors and omissions complained of herein.

10. Defendant TALIB SADIQ ("Sadiq") is an individual, male person of legal age, who, from July 1, 2023 to on or about April 22, 2024, was an employee of the District and served as the Principal of ARMS. At all times relevant to this action, Sadiq exercised control over the terms and conditions of Santos's employment and issued the notice of intent to dismiss Santos. At all times relevant to this action, Sadiq was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, who actively participated in, and stands responsible for the unconstitutional, wrongful, and tortious acts, errors and omissions complained of herein.

## Jurisdiction and Venue

11. This Court has federal question jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 and 42 U.S.C. § 2000e et seq. pursuant to 28 U.S.C. § 1331.

12. This Court's exercise of supplemental jurisdiction with respect to Plaintiff's state law claims is warranted because they are so related to Plaintiff's federal claims that they form part of the same case or controversy.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendants have offices, conduct business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred herein.

14. Assignment to the Western Division of this Court is proper because the District is located in Amherst, Massachusetts, and the acts and omissions complained of herein occurred there.

15. Personal jurisdiction exists over Defendants in that they maintain sufficient minimal contacts in the Commonwealth of Massachusetts. Specifically, Defendants engage in systematic and continuous activity in the Commonwealth of Massachusetts. Moreover, a substantial portion of the actions complained of herein occurred in the Commonwealth of Massachusetts.

## Administrative Procedures

16. On or about September 6, 2024, Santos filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (the "MCAD") against the District, Sadiq, Morris, Slaughter, and Diego Sharon for discrimination based on national origin (Puerto Rican) and religion (Christianity) in violation of Mass. Gen. Laws c. 151B, MCAD Docket No. 24SEM02957 (the "MCAD administrative charge"), which was simultaneously filed with the Equal Employment Opportunity Commission (the "EEOC") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., EEOC Charge No. 16C-2024-02873 (the "EEOC administrative charge").

17. On or about July 31, 2026, Santos withdrew the MCAD administrative charge and requested a Notice of Right to Sue from the EEOC so he could file this action.

18. On September 16, 2026, the EEOC issued a Notice of Right to Sue.

19. Plaintiff has satisfied all conditions precedent to filing this civil action, and his claims are timely filed.

## Factual Allegations

### A. Santos's Background, Faith, and Employment with the District

20. Santos is a Puerto Rican-American Christian man who resides in Springfield, Massachusetts.

21. Santos is a native Spanish speaker who speaks English as a second language.

22. Santos's Christian faith is central to his identity, family life, moral beliefs, and understanding of parental responsibility.

23. Santos sincerely believes that God created human beings male and female.

24. Santos sincerely believes that parents have the right and responsibility to guide the moral, religious, and social development of their own children.

25. Santos sincerely believes that people of faith have the right to speak publicly about religion, parenting, sex, gender, family, and contested cultural issues without losing their livelihoods.

26. Santos also sincerely believes that he must treat all students with dignity, compassion, and respect, including students whose identities, beliefs, or life experiences differ from his own.

27. Santos's religious beliefs did not prevent him from counseling, supporting, or serving LGBTQ+ students.

28. Santos did not impose his religious beliefs on students.

29. Santos did not refuse services to any student because of sexual orientation, gender identity, religion, race, national origin, or any other protected characteristic.

30. Santos has devoted his professional career to serving students, including students with social, emotional, behavioral, family, and mental-health needs.

31. Before joining the District, Santos worked for approximately eighteen years as a school adjustment counselor.

32. During his career, Santos worked with transgender students and students from the LGBTQ+ community.

33. Before April 2023, Santos had never been accused of any wrongdoing, either in his prior employment or at the District.

34. In or about 2019, Santos began working for the District as a school adjustment counselor at ARMS.

35. Santos held professional teacher status.

36. Santos's job was to support students, provide counseling services, assist families, respond to student crises, and help students navigate difficult personal, social, emotional, and educational issues.

37. Santos performed his job successfully for years.

38. Before the events described below, Santos had not been disciplined for discrimination against students.

39. Before the events described below, Santos had not been disciplined for proselytizing to students.

40. Before the events described below, Santos had not been disciplined for mistreating transgender students or LGBTQ+ students.

41. Delinda Dykes ("Dykes") was a guidance counselor at ARMS.

42. Doreen Reyes ("Reyes"), formerly Doreen Cunningham, was the District's Assistant Superintendent for Diversity, Equity, and Human Resources.

43. Tania Cabrera ("Cabrera") was the seventh-grade guidance counselor at ARMS and is Santos's daughter.

44. Dykes, Reyes, and Cabrera are not plaintiffs in this action.

45. They are referenced only where their treatment forms part of the same factual sequence, supplies relevant context, or supports Santos's allegations of motive, pretext, selective enforcement, and public-pressure-driven decision-making.

**B. Facebook and Private Citizen Speech**

46. Facebook is a social-media platform that allows users to create personal accounts, publish text and images, share or repost content created by others, comment on content, and interact with other users.

47. A Facebook user's personal profile is associated with that individual user, not with the user's employer.

48. A Facebook user may publish original content or share content created by another user.

49. When a user shares or reposts another person's post, the shared post appears on the user's own profile or timeline, subject to the user's privacy settings.

50. Facebook users may control the visibility of their profiles and posts through privacy settings, including by making content public, limited to friends, or otherwise restricted.

51. Santos maintained a personal Facebook account.

52. Santos's Facebook account was not a District account.

53. Santos did not operate his personal Facebook account as part of his job duties.

54. Santos did not use his personal Facebook account to deliver District services, communicate official District policy, or perform work as a school adjustment counselor.

55. Santos did not identify himself in the repost as a teacher, school adjustment counselor, District employee, ARMS employee, or spokesperson for the District. Santos did not identify himself as a District employee on his Facebook profile.

56. Santos's personal Facebook activity was private-citizen speech unless and until Defendants chose to make it an employment issue.

**C. Santos's September 2022 Facebook Repost**

57. On or about September 5, 2022, Santos reposted content on his personal Facebook page. A true and accurate copy of the repost as it appeared on Santos's Facebook page is reproduced below:



Hector L Santos

Hector L Santos
Sep 5, 2022 ·

David Fierro is with Tamara Herrera. · Follow
Jul 1, 2022 ·

My opinion is obvious:
if my 4-year-old son tells me that he wants to dress up as a princess, I will tell him no, becaus he was born a child and the children are prince I will try to get my daughter to prefer to play a sport of her liking or violin, but I will not suppor male behaviors as well Since I'm not going to endorse someone telling you that there is a thi gender, I'm going to teach you that no, that there are only two chromosomes, that yes, tha God created man in the beginning was Adam and Eve.

"Ahhhh but ""you're square, authoritarian, legalistic, closed-minded, you can't force the creature."""".
Sorry (for you) but the answer is yes
just like i force him to eat vegetables, do his chores, brush his teeth and go to the dentist, i also force him to sleep at a certain time, i can also choose what clothes to buy him. Why is it difficult for me,
Because in life there are rules, you can't do everything you want, when you want, as you want at the time you want; and that's not why I love you less, quite the opposite! Because I lov him I do.

Now if later I'm an adult.




58. The post was originally authored by David Fierro, not Santos.

59. Santos reposted the post without adding any commentary of his own.

60. The repost contained religious imagery depicting the hand of Jesus Christ blocking a rainbow from reaching two children.

61. The repost concerned religion, parenting, children, sex, gender, parental authority, and the right to speak publicly on contested cultural issues.

62. Santos's repost reflected his sincerely held Christian beliefs about faith, creation, sex, gender, parenting, and parental responsibility.

63. Santos's repost also reflected his belief that people of faith have the right to speak publicly on contested cultural issues without losing their jobs.

64. The text of the repost was written in Spanish. As translated to English by Facebook, it stated:

> My opinion is obvious: If my 4-year old son tells me that he wants to dress as a princess, I will tell him no, because he was born a child and the children are princes; I will try to get my daughter to prefer to play a sport of her liking or violin, but I will not support male behaviors as well Since I'm not going to endorse someone telling you that there is a third gender, I'm going to teach you that no, that there are only two chromosomes, that yes, that God created man in the beginning was Adam and Eve.
>
> "Ahhhh but" "you're square, authoritarian, legalistic, closed-minded, you can't force the creature."
>
> Sorry (for you) but the answer is yes Just like I force him to eat vegetables, do his chores, brush his teeth and go to the dentist, I also force him to sleep at a certain time, I can also choose what clothes to buy him. Why is it difficult for me, Because in life there are rules, you can't do everything you want, when you want, as you want at the time you want; and that's not why I love you less, quite the opposite! Because I love him I do.

65. The repost continued:

> Now if later I'm an adult. (because that was the example my parents gave me and because that is the legal age where one acquires ability in fact) my son comes and says to me: Dad, from today I want to be Muslim, Buddhist, vegetarian, dress as a woman, change sex, be spiritualist, cannibal, vampire or a vampire Tree ... well, there will be another story, but BEFORE me you enter this under my roof no. First, I will not run away from my responsibility as a father/mother and my duty to teach them things as they are.

66. The repost concluded:

> If you think the same, I invite you to express it and don't be silent if others scream their rights I scream mine. I've said! Although they are outraged!

67. Santos reposted the content on his own time and in his private capacity.

68. Santos did not direct the repost to students.

69. Santos did not send the repost to any student.

70. Santos did not use District email, District letterhead, District equipment, District curriculum, or any District-controlled platform to make the repost.

71. Santos did not post the content to attack any student.

72. Santos did not post the content to announce that he would treat students differently.

73. Santos did not post the content to communicate District policy.

74. Santos did not post the content as a school adjustment counselor.

75. Santos posted the content as a private citizen, father, and Christian.

76. Santos explained that the repost was directed toward his own children and represented his belief that children living in his home must follow his rules.

77. Santos also stated that he had no intent to harm anyone and would not have posted the image if he thought it would harm anyone.

78. When the repost was brought to his attention, Santos understood how some people could perceive it as offensive and made his Facebook page private.

### D. The District's Preexisting Knowledge That the Facebook Repost Was Protected Speech

79. In or about April 2023, the District became aware of Santos's Facebook repost.

80. On information and belief, the repost was brought to the attention of then-Superintendent Morris.

81. Morris understood that Santos had made the repost on his personal Facebook page.

82. Morris understood that Santos had not made the repost as part of his job duties.

83. Morris understood that Santos had not used District resources to make the repost.

84. Morris understood that the repost concerned Santos's personal religious, parental, and cultural views.

85. Morris consulted District counsel about the repost.

86. On information and belief, Morris was advised that the District could not terminate Santos for the repost because Santos had First Amendment rights.

87. On information and belief, Morris communicated in writing that Santos's Facebook repost was protected by the First Amendment and that the District could not fire him for it.

88. Santos later requested that communication through public-records requests.

89. The District did not produce the communication to Santos.

90. Despite knowing that Santos's repost implicated protected private-citizen speech, the District later used that same repost as a basis to terminate him.

**E. The Public Firestorm at Amherst Regional Middle School**

91. In the spring of 2023, ARMS became the subject of public controversy involving allegations about student gender identity, pronoun use, religion, race, and the treatment of LGBTQ+ students.

92. The controversy became political, public, and highly charged.

93. Amid the controversy, more than half of the members of the School Committee resigned.

94. The controversy also placed intense pressure on employees associated, rightly or wrongly, with the allegations.

95. Santos was swept into that controversy.

96. The District did not respond by fairly separating protected speech from workplace conduct.

97. The District did not respond by fairly separating substantiated facts from public accusation.

98. Instead, the District allowed public pressure, political pressure, and community outrage to drive employment decisions.

**F. Santos's Return to Work and Administrative Leave**

99. In or about late April 2023, the District sent Santos home for one week.

100. After that week, Reyes called Santos to a meeting.

101. At the meeting, Reyes returned Santos's District identification and keys and sent him back to his office.

102. On or about May 8, 2023, Santos arrived at his office at approximately 9:00 a.m.

103. Santos's co-workers were surprised to see him and began making telephone calls.

104. At approximately 12:00 p.m., Human Resources called Santos.

105. Santos went to Human Resources, where he was handed an official letter placing him on administrative leave.

106. Within hours of allowing Santos to return to work, the District reversed course and removed him from the workplace.

107. Santos wanted the District to evaluate the facts fairly and to recognize that language barriers and English-as-a-second-language issues could affect occasional pronoun mistakes, particularly in a changing and highly sensitive area of language use.

108. Santos did not receive a fair, neutral, or politically insulated process.

**G. The Graphic Article**

109. On or about May 9, 2023, an article was published in The Graphic, the student newspaper associated with Amherst Regional High School.

110. The article accused Santos and Dykes of misconduct involving transgender and LGBTQ+ students.

111. The article alleged that Santos and Dykes misgendered and deadnamed students.

112. The article alleged that Santos and Dykes failed to support LGBTQ+ students.

113. The article alleged that religion had improperly entered the counseling office.

114. The article alleged that anti-LGBTQ prayer had occurred.

115. The article referenced Santos's Facebook repost and portrayed it as anti-LGBTQ.

116. The article also discussed Cabrera.

117. The article tied Reyes to Santos, Dykes, and Cabrera through social and religious association.

118. The article did not establish that Santos had discriminated against any student, proselytized to any student, or refused to serve transgender or LGBTQ+ students.

119. The article did not establish that Santos had used District time or District resources to publish the Facebook repost.

120. The Graphic article was published the day after Santos returned to work.

121. On information and belief, the article was published in retaliation against Morris for failing to fire Santos.

122. The article created public pressure for the District to take employment action against Santos.

**H. Santos's Administrative Leave and the District's Investigation**

123. Santos remained on administrative leave while the District investigated allegations involving him.

124. The investigation was conducted by outside investigator Edward Mitnick.

125. The investigation included allegations concerning pronoun use.

126. The investigation included allegations concerning religion and prayer.

127. The investigation included Santos's Facebook repost.

128. Santos cooperated with the investigation.

129. Santos denied intentionally discriminating against students.

130. Santos denied targeting students based on gender identity or sexual orientation.

131. Santos denied proselytizing to students during the school day.

132. Santos denied participating in a prayer session in which any person made a homophobic statement about an "LGBTQ gay demon."

133. Santos explained his religious beliefs.

134. Santos explained his Puerto Rican background.

135. Santos explained that he is a native Spanish speaker and that English is his second language.

136. Santos explained that pronoun usage was sometimes difficult for him.

137. Santos explained that any pronoun mistakes were not intentional discrimination.

138. Santos had not previously been reprimanded for misgendering a student before being placed on leave.

139. Other District employees also misgendered students.

140. Misgendering was not treated as a terminable offense when committed by other employees.

141. The District did not apply its standards evenly.

142. The District treated Santos more harshly because of his religion, national origin, and private Facebook speech.

### I. The Investigation Did Not Substantiate the Most Serious Accusations Against Santos

143. The investigation did not substantiate the allegation that Santos participated in a prayer session in which another employee made an offensive homophobic statement about an "LGBTQ gay demon."

144. The investigation did not find credible evidence that Santos participated in prayer sessions on school property during school hours.

145. The investigation did not establish that Santos proselytized to students during school hours.

146. The investigation did not establish that Santos used District resources to advance his religious beliefs.

147. The investigation did not establish that Santos refused to serve transgender students.

148. The investigation did not establish that Santos refused to serve LGBTQ+ students.

149. The investigation did not establish that Santos's Facebook repost caused actual disruption to school operations before Defendants made it an issue.

150. The investigation did not establish that Santos directed the Facebook repost to students.

151. The investigation did not establish that any student received the Facebook repost from Santos.

152. The investigation did not establish that Santos posted the Facebook repost as part of his job duties.

153. The investigation showed that Santos posted the content on his own time and in his private capacity.

154. Even after the most inflammatory allegations were not substantiated, Defendants continued moving toward termination.

### J. The District's Treatment of Reyes During the Same Public Firestorm

155. The Graphic article did not accuse Reyes herself of violating Title IX, but tied her to Santos, Dykes, and Cabrera through social and religious association.

156. On or about May 22, 2023, Acting Superintendent Slaughter and School Committee Chair Ben Herrington met with Reyes and informed her that she was being placed on administrative leave.

157. When Reyes asked why she was being placed on leave, Slaughter stated that the reason was "political."

158. Defendants later admitted in the Reyes litigation that Slaughter made the decision to place Reyes on administrative leave and that Herrington attended the meeting.

159. Defendants stated that Marta Guevara communicated with Slaughter about employees being upset that Reyes was present while the District's outside investigator, Edward Mitnick, conducted interviews.

160. Defendants stated that members of the Amherst-Pelham Education Association ("APEA") informed Guevara that a faculty walkout was being considered because of Reyes's presence in the building.

161. Defendants claimed Slaughter placed Reyes on paid administrative leave because of the highly volatile environment.

162. Reyes alleged that no other administrator had been placed on administrative leave during an investigation during her employment.

163. Reyes alleged that Defendants removed her email access after placing her on leave.

164. Reyes alleged that, of approximately twenty employees placed on administrative leave during investigations in the preceding six years, none had email access removed.

165. After Reyes was placed on leave, Herrington publicly disclosed that she had been placed on administrative leave pending the Title IX investigation, implying that she was the subject of that investigation.

166. Slaughter publicly stated by email to parents and others that Reyes had been placed on administrative leave pending the conclusion of the current Title IX investigation.

167. Through counsel, Reyes asked why she had been placed on administrative leave and whether she was a respondent in the Title IX investigation.

168. Mitnick responded that he was not aware of any formal written complaint pertaining to Reyes.

169. Mitnick also stated that the investigation concerning Reyes was not governed by the District's Title IX policy because it was not a Title IX investigation.

170. Reyes alleged that Mitnick told her Herrington had told him to "find something" against her.

171. Reyes was later terminated.

172. The District's treatment of Reyes is relevant here because it shows the political and public-pressure environment in which Defendants acted against Santos.

173. Reyes was not the cause of the unlawful treatment of Santos.

174. Reyes was another District employee swept into the same political firestorm.

**K. The District's Treatment of Dykes**

175. Dykes was also accused in connection with the same public controversy.

176. Like Santos, Dykes was accused of misconduct involving gender identity, pronouns, LGBTQ+ students, and religion.

177. Like Santos, Dykes became a target of public pressure.

178. Like Santos, Dykes was terminated.

179. Dykes challenged her termination through arbitration.

180. The arbitrator ordered Dykes reinstated.

181. The arbitrator found that the District failed to prove the most serious allegations against Dykes.

182. The arbitrator found a substantial gap between the accusations made against Dykes and the evidence presented.

183. The arbitrator found that the evidence did not establish that Dykes discriminated against students based on gender identity.

184. The arbitrator found that Dykes cared about LGBTQ+ students.

185. The Hampshire Superior Court confirmed the arbitration award reinstating Dykes.

186. The District's treatment of Dykes is relevant here because it shows that the same public controversy produced severe employment actions not supported by the evidence ultimately developed.

187. The District's treatment of Dykes further supports Santos's allegation that Defendants acted from political pressure, public pressure, pretext, and selective enforcement rather than a fair assessment of the facts.

**L. The District's Treatment of Cabrera**

188. Cabrera was also drawn into the same public controversy.

189. Cabrera was placed on paid administrative leave.

190. Cabrera was told that she was not being investigated.

191. Cabrera was nevertheless removed from the workplace.

192. Cabrera's email access was canceled.

193. Cabrera later received notice that her contract would not be renewed.

194. The APEA filed a grievance challenging Cabrera's non-renewal.

195. The grievance alleged that Cabrera and another employee had received non-renewal notices without evaluation or just cause.

196. The District's treatment of Cabrera is relevant because it shows the breadth of the District's response to the same public controversy and the District's willingness to impose employment consequences before fairly substantiating misconduct.

**M. The Notice of Intent to Dismiss Santos**

197. On or about November 13, 2023, Principal Sadiq issued Santos a notice of intent to dismiss.

198. The notice identified three asserted grounds for dismissal.

199. The first asserted ground involved alleged misgendering.

200. The second asserted ground involved Santos's Facebook repost.

201. The third asserted ground involved alleged proselytizing.

202. The District claimed that any one of the three asserted grounds would independently warrant dismissal.

203. That position was pretextual.

204. The most inflammatory religious allegation had not been substantiated.

205. The alleged proselytizing was not supported by sufficient evidence.

206. The District knew that other employees had misgendered students.

207. The District knew that occasional pronoun mistakes by persons other than Santos had occurred during the investigation itself.

208. The District knew that Santos is a native Spanish speaker who speaks English as a second language.

209. The District knew that Santos had not previously been disciplined for misgendering students.

210. The District knew that Santos's Facebook repost was made on his own time and in his private capacity.

211. The District knew that Santos did not direct the repost to students.

212. The District knew that Santos did not use District resources to make the repost.

213. The District knew, or had been advised, that terminating Santos for the repost raised serious First Amendment concerns.

214. The District nevertheless treated Santos's private Facebook repost as a terminable offense.

**N. The Decision to Terminate Santos**

215. Slaughter concurred in the recommendation to terminate Santos.

216. Sadiq participated in the decision to terminate Santos.

217. The School Committee and District ratified, approved, or implemented the termination.

218. Defendants terminated Santos effective December 2023.

219. Defendants terminated Santos because of his protected private-citizen speech.

220. Defendants terminated Santos because of the religious viewpoint expressed in the Facebook repost.

221. Defendants terminated Santos because his Christian beliefs were unpopular with certain members of the school community.

222. Defendants treated Santos's traditional Christian beliefs about sex, gender, and parenting as disqualifying beliefs, even though Santos had never refused to serve any student and had never imposed those beliefs on students.

223. Defendants did not merely object to alleged workplace conduct.

224. Defendants objected to Santos's religious viewpoint.

225. Defendants treated Santos's Christian beliefs about sex, gender, parenting, and creation as evidence that he was unfit to serve students.

226. Defendants assumed, without evidence, that because Santos held traditional Christian beliefs, he could not fairly counsel or support LGBTQ+ students.

227. That assumption was false.

228. Santos had served students from many backgrounds throughout his career, including LGBTQ+ students.

229. Defendants punished Santos not for refusing to do his job, but for privately expressing religious beliefs that Defendants and certain members of the community considered unacceptable.

230. Defendants terminated Santos because he is Puerto Rican-American and a native Spanish speaker whose English-as-a-second-language issues were treated more harshly than comparable language mistakes by others.

231. Defendants terminated Santos because they wanted to appease public and political pressure.

232. Defendants terminated Santos because they wanted to show the community that they had taken severe action against someone associated with the controversy.

233. Defendants used allegations of student safety and nondiscrimination as a pretext to punish Santos for protected speech, religion, and national origin.

234. Defendants did not have a legitimate, non-retaliatory, non-discriminatory basis to terminate Santos.

235. Defendants' stated reasons for termination shifted, expanded, and were not supported by a fair assessment of the evidence.

236. Defendants treated Santos more harshly than similarly situated employees outside his protected classes.

237. Defendants treated Santos more harshly than employees who committed comparable or more serious conduct but did not share his protected characteristics or did not engage in the same protected speech.

**O. Santos's Arbitration**

238. Santos challenged his dismissal through statutory arbitration.

239. The arbitrator upheld the dismissal based on the Facebook repost.

240. The arbitrator did not reach the District's other two asserted grounds for dismissal.

241. The arbitrator rejected Santos's First Amendment argument on the ground that he was commenting on family matters rather than LGBTQIA+ public matters.

242. The arbitration decision failed to vindicate Santos's federal constitutional rights.

243. Santos's private-citizen speech addressed issues of public concern, including gender identity, sex, religion, parenting, parental authority, and the right to speak publicly on contested cultural issues.

244. Defendants violated Santos's constitutional and statutory rights regardless of the arbitration result.

245. Santos brings this action to vindicate those rights.

**P. Post-Termination Harm to Santos's Career**

246. Santos's termination severely damaged his professional reputation.

247. Santos's termination damaged his ability to continue working in his chosen profession as a school adjustment counselor.

248. Santos spent months seeking new employment after the District terminated him.

249. Santos applied for positions for which he was qualified.

250. Santos received interest from prospective employers.

251. Santos experienced job opportunities being blocked, delayed, or rescinded after prospective employers learned about the Amherst events.

252. Springfield Public Schools and Westfield Public Schools each stated in writing that the Amherst events prevented Santos from being hired.

253. Santos eventually obtained employment with Springfield International Charter School in or about January 2025.

254. Santos later pursued other opportunities.

255. Santos received an offer from Legacy Academy.

256. Santos's Legacy Academy opportunity was rescinded after his name reached upper management.

257. Santos received an opportunity involving DeBerry School.

258. That opportunity was also rescinded after his name reached upper management.

259. Santos resigned from Springfield International Charter School in or about August 2025 after the Legacy Academy offer was rescinded.

260. The District's actions made Santos radioactive in his profession.

261. The District's actions caused prospective employers to treat Santos as if he were unfit to serve students, even though the most serious allegations against him had not been substantiated.

262. The District's actions impaired Santos's ability to earn a living.

263. The District's actions impaired Santos's ability to support himself and his family.

264. The District's actions inflicted severe emotional distress, humiliation, embarrassment, and fear about his future.

**Q. Defendants' Motive and Pretext**

265. Defendants knew Santos had engaged in private-citizen speech.

266. Defendants knew Santos's Facebook repost was not made pursuant to his official duties.

267. Defendants knew Santos's Facebook repost involved religious, parental, cultural, and political issues.

268. Defendants knew Santos had not sent the repost to students.

269. Defendants knew Santos had not used District resources to make the repost.

270. Defendants knew the most inflammatory religious allegations against Santos had not been substantiated.

271. Defendants knew Santos had not previously been disciplined for the alleged conduct used to justify termination.

272. Defendants knew other employees had misgendered students.

273. Defendants knew that Santos's national origin and English-as-a-second-language background affected how he understood and used English pronouns.

274. Defendants did not terminate Santos because he was unable to perform his job.

275. Defendants did not terminate Santos because he posed a threat to students.

276. Defendants did not terminate Santos because he refused to serve transgender or LGBTQ+ students.

277. Defendants terminated Santos because his protected speech and religious viewpoint became politically inconvenient.

278. Defendants terminated Santos because they wanted to appease a public controversy.

279. Defendants terminated Santos because his Puerto Rican, Christian, Spanish-speaking identity made him an easier target in the District's public response.

280. Defendants' asserted reasons for terminating Santos were pretextual.

281. Defendants' conduct was intentional, malicious, reckless, and in callous disregard of Santos's constitutional and statutory rights.

**R. Harm to Santos**

282. Defendants' conduct damaged Santos's professional reputation and ability to work in his chosen profession.

283. Defendants' actionable conduct complained of herein proximately caused Santos to suffer grave and substantial pecuniary damages, including lost wages, fringe benefits, employment benefits, lost earning capacity, as well as other pecuniary damages, now, and in the future.

284. Defendants' actionable conduct complained of herein forced Santos to suffer substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a loss of income, fear regarding Santos's ability to find new suitable employment, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

285. Defendants' conduct also damaged Santos's personal and professional reputation and impaired his future employment opportunities.

286. The conduct of each Defendant warrants the imposition of statutory punitive or exemplary damages, because Defendants intentionally and maliciously and without justification or excuse retaliated against Santos for his protected speech and subjected him to discriminatory terms and conditions of employment based on his religion and national origin, thereby demonstrating each Defendant's reckless and callous indifference to Santos's constitutional rights and his right to work in an environment free from unlawful discrimination, and demonstrating each Defendant's malice or ill will.

287. Defendants stand jointly and severally liable to Santos for his damages resulting from the Defendants' illegal and wrongful actions complained of herein.

## CLAIMS AGAINST DEFENDANT AMHERST-PELHAM REGIONAL SCHOOL DISTRICT

### COUNT I
### RELIGIOUS DISCRIMINATION
### VIOLATION OF 42 U.S.C. § 2000e-2(a)

288. Plaintiff hereby incorporates by reference paragraphs 1-287 of this Verified Complaint as though fully set forth herein.

289. Santos is a Christian and holds sincerely held religious beliefs concerning God, creation, sex, gender, family, and parental responsibility.

290. Santos was qualified for his position as a school adjustment counselor and performed his job successfully for years without discipline for discrimination, proselytizing, or mistreatment of any student.

291. Defendant District knew of Santos's Christian faith, including through his Facebook repost, the allegations in The Graphic article, and the District's own investigation, which examined his religious expression.

292. Defendant District terminated Santos's employment because of his religion, including because of the religious viewpoint expressed in his Facebook repost and because his traditional Christian beliefs were unpopular with certain members of the school community.

293. Defendant District treated Santos's Christian beliefs as disqualifying and assumed, without evidence, that because he held those beliefs he could not fairly counsel or support LGBTQ+ students.

294. Defendant District treated Santos more harshly than similarly situated employees outside his protected class, including non-Christian employees who misgendered students without being terminated.

295. Defendant District's stated reasons for terminating Santos were false, pretextual, and not the real reasons for its conduct.

296. By terminating Santos because of his religion, Defendant violated 42 U.S.C. § 2000e-2(a) and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 283-286 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

**COUNT II**
**RELIGIOUS DISCRIMINATION**
**VIOLATION OF MASS. GEN. LAWS c. 151B**

297. Plaintiff hereby incorporates by reference paragraphs 1-296 of this Verified Complaint as though fully set forth herein.

298. Santos is a Christian and holds sincerely held religious beliefs concerning God, creation, sex, gender, family, and parental responsibility.

299. Defendant District knew of Santos's Christian faith.

300. Defendant District terminated Santos's employment because of his religious creed, including because of the religious viewpoint expressed in his Facebook repost.

301. Defendant District treated Santos more harshly than similarly situated employees who were not Christian, including employees who misgendered students without being terminated.

302. Defendant District's stated reasons for terminating Santos were false, pretextual, and not the real reasons for its conduct.

303. By terminating Santos because of his religious creed, Defendant violated Mass. Gen. Laws c. 151B and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 283-286 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

**COUNT III**
**NATIONAL ORIGIN DISCRIMINATION**
**VIOLATION OF 42 U.S.C. § 2000e-2(a)**

304. Plaintiff hereby incorporates by reference paragraphs 1-303 of this Verified Complaint as though fully set forth herein.

305. Santos is Puerto Rican-American and a native Spanish speaker who speaks English as a second language.

306. Defendant District knew of Santos's national origin and that English is his second language, including because Santos explained to the District that pronoun usage in English was sometimes difficult for him.

307. Defendant District relied on alleged misgendering as a ground for terminating Santos.

308. Other District employees, who were not Puerto Rican and were native English speakers, misgendered students without being terminated.

309. Defendant District treated Santos's language-related pronoun mistakes more harshly than comparable mistakes by employees outside his protected class.

310. Defendant District's stated reasons for terminating Santos were false, pretextual, and not the real reasons for its conduct.

311. By terminating Santos because of his national origin, Defendant violated 42 U.S.C. § 2000e-2(a) and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 283-286 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

**COUNT IV**
**NATIONAL ORIGIN DISCRIMINATION**
**VIOLATION OF MASS. GEN. LAWS c. 151B**

312. Plaintiff hereby incorporates by reference paragraphs 1-311 of this Verified Complaint as though fully set forth herein.

313. Santos is Puerto Rican-American and a native Spanish speaker who speaks English as a second language.

314. Defendant District knew of Santos's national origin and that English is his second language.

315. Defendant District treated Santos's language-related pronoun mistakes more harshly than comparable mistakes by employees outside his protected class and relied on those mistakes as a ground for termination.

316. Defendant District failed to reasonably accommodate Santos's language-related challenges and instead terminated him because of them.

317. By terminating Santos because of his national origin, Defendant violated Mass. Gen. Laws c. 151B and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 283-286 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

**COUNT V**
**FIRST AMENDMENT RETALIATION**
**VIOLATION OF 42 U.S.C. § 1983**

318. Plaintiff hereby incorporates by reference paragraphs 1-317 of this Verified Complaint as though fully set forth herein.

319. At all relevant times to this matter, Santos was employed by a public employer.

320. On or about September 5, 2022, Santos reposted on his personal Facebook page a post concerning matters of public concern, including religion, parenting, parental authority, sex, gender identity, and the right of people of faith to speak publicly on contested cultural issues (the "Facebook repost").

321. Santos made the Facebook repost as a private person, on his own time, outside of the workplace.

322. Santos did not make the Facebook repost pursuant to his official duties as a school adjustment counselor.

323. In the Facebook repost, Santos did not identify himself as a teacher or school adjustment counselor.

324. In the Facebook repost, Santos did not identify himself as an employee of the District or ARMS.

325. In the Facebook repost, Santos did not reference any matters pertaining to his workplace, supervisors, co-workers, or students.

326. Santos did not direct the Facebook repost to any student, did not send it to any student, and did not use any District resources to make it.

327. By making the Facebook repost, Santos was speaking as a citizen on matters of public concern.

328. The Facebook repost is religious and political speech protected under the First Amendment to the United States Constitution.

329. The Facebook repost was posted in September 2022, and approximately eight months passed before it was brought to the District's attention in April 2023.

330. No evidence established that any student viewed the Facebook repost and, as a result, felt uncomfortable receiving counseling services from Santos.

331. No evidence established that the Facebook repost itself disrupted the operations of ARMS or the District before Defendants made it an employment issue.

332. On or about November 13, 2023, Sadiq issued Santos a notice of intent to dismiss pursuant to Mass. Gen. Laws c. 71, § 42, which identified the Facebook repost as an independent ground for dismissal and stated that any one of the asserted grounds, alone, would warrant dismissal.

333. On or about December 13, 2023, the District terminated Santos's employment.

334. Santos's speech was a substantial or motivating factor in the decision to terminate him because the District expressly identified the Facebook repost as an independent ground for dismissal, and the arbitrator upheld the dismissal based on the Facebook repost alone.

335. Santos's interest, as a citizen, in commenting upon matters of public concern outweighed any interest the District had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the District did not have an adequate justification for terminating Santos.

336. Furthermore, any prediction the District made that the Facebook repost would impair the operation of ARMS or Santos's ability to serve students was not reasonable, because Santos had served students of all backgrounds, including LGBTQ+ students, throughout his career, and no evidence established that he ever refused to serve any student.

337. The reasons the District has provided for terminating Santos are not credible and, thus, evidence of pretext for the true reason for Santos's termination, which is because he expressed religious views on matters of public concern that were unpopular with certain members of the school community.

338. When Defendants terminated Santos, they were acting under the color of law within the meaning of 42 U.S.C. § 1983.

339. The Superintendent is the executive head of the District, and under Mass. Gen. Laws c. 71, § 42, the dismissal of a teacher with professional teacher status requires the action of the principal and the approval of the Superintendent.

340. Slaughter, acting as the District's Interim Superintendent and the official with final policymaking authority over Santos's dismissal, concurred in and approved the decision to terminate Santos because of the Facebook repost.

341. The School Committee ratified, approved, or implemented the decision to terminate Santos, with knowledge that the Facebook repost was an independent ground for his dismissal.

342. And because Santos's injury was caused by persons with final policymaking authority, and was ratified by the District's governing body, the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, the District is liable.

343. Defendants' conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

344. As a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 283-286 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

## CLAIMS AGAINST DEFENDANTS MICHAEL MORRIS, DOUGLAS SLAUGHTER, AND TALIB SADIQ

### COUNT VI
### VIOLATION OF 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION

345. Plaintiff hereby incorporates by reference paragraphs 1-344 of this Verified Complaint as though fully set forth herein.

346. At all relevant times to this matter, Santos was employed by a public employer.

347. On or about September 5, 2022, Santos reposted on his personal Facebook page a post concerning matters of public concern, including religion, parenting, parental authority, sex, gender identity, and the right of people of faith to speak publicly on contested cultural issues (the "Facebook repost").

348. Santos made the Facebook repost as a private person, on his own time, outside of the workplace.

349. Santos did not make the Facebook repost pursuant to his official duties as a school adjustment counselor.

350. In the Facebook repost, Santos did not identify himself as a teacher or school adjustment counselor.

351. In the Facebook repost, Santos did not identify himself as an employee of the District or ARMS.

352. In the Facebook repost, Santos did not reference any matters pertaining to his workplace, supervisors, co-workers, or students.

353. Santos did not direct the Facebook repost to any student, did not send it to any student, and did not use any District resources to make it.

354. By making the Facebook repost, Santos was speaking as a citizen on matters of public concern.

355. The Facebook repost is religious and political speech protected under the First Amendment to the United States Constitution.

356. The Facebook repost was posted in September 2022, and approximately eight months passed before it was brought to the District's attention in April 2023.

357. No evidence established that any student viewed the Facebook repost and, as a result, felt uncomfortable receiving counseling services from Santos.

358. No evidence established that the Facebook repost itself disrupted the operations of ARMS or the District before Defendants made it an employment issue.

359. On or about November 13, 2023, Sadiq issued Santos a notice of intent to dismiss pursuant to Mass. Gen. Laws c. 71, § 42, which identified the Facebook repost as an independent ground for dismissal and stated that any one of the asserted grounds, alone, would warrant dismissal.

360. On or about December 13, 2023, the District terminated Santos's employment.

361. Santos's speech was a substantial or motivating factor in the decision to terminate him because the District expressly identified the Facebook repost as an independent ground for dismissal, and the arbitrator upheld the dismissal based on the Facebook repost alone.

362. Santos's interest, as a citizen, in commenting upon matters of public concern outweighed any interest the District had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the District did not have an adequate justification for terminating Santos.

363. Furthermore, any prediction the District made that the Facebook repost would impair the operation of ARMS or Santos's ability to serve students was not reasonable, because Santos had served students of all backgrounds, including LGBTQ+ students, throughout his career, and no evidence established that he ever refused to serve any student.

364. The reasons the District has provided for terminating Santos are not credible and, thus, evidence of pretext for the true reason for Santos's termination, which is because he expressed religious views on matters of public concern that were unpopular with certain members of the school community.

365. When Defendants terminated Santos, they were acting under the color of law within the meaning of 42 U.S.C. § 1983.

366. In April 2023, Morris received the Facebook repost, consulted District counsel about it, and, upon information and belief, was advised that the District could not terminate Santos for it because Santos had First Amendment rights.

367. Upon information and belief, Morris communicated in writing that the Facebook repost was protected by the First Amendment and that the District could not fire Santos for it.

368. Morris nevertheless placed Santos on administrative leave because of the Facebook repost and directed and expanded the investigation of Santos that examined the Facebook repost, which set in motion the series of events that he knew or reasonably should have known would cause Santos to be terminated because of his protected speech.

369. Sadiq issued the notice of intent to dismiss Santos, which identified the Facebook repost as an independent ground for dismissal.

370. Slaughter concurred in and approved the decision to terminate Santos, including on the ground of the Facebook repost.

371. Prior to terminating Santos, Defendants Morris, Slaughter, and Sadiq were aware that the Facebook repost constituted protected speech under the First Amendment to the United States Constitution because the District had been advised that the repost was protected speech, the District's investigator found that Santos made the repost on his own time and in his private capacity, and the District knew that Santos did not direct the repost to students or use District resources to make it.

372. Defendants Morris, Slaughter, and Sadiq therefore knew or reasonably should have known that Santos as a citizen possessed constitutionally-protected rights to be free from retaliatory treatment by them and Defendant District even if Santos vigorously exercised his right to free speech.

373. It was not objectively reasonable for Defendants to believe that they and Defendant District's unconstitutional, wrongful, and tortious course of conduct concerning Santos was legally permissible in light of legal rules in existence at the time of the conduct.

374. It was not objectively reasonable for Defendants to believe that their actions were permissible under law.

375. Defendants are not entitled to immunity or qualified immunity regarding their unconstitutional, wrongful, and tortious course of conduct concerning Santos complained of herein while acting under color of state law, because their conduct was clearly prohibited by federal law at the time, and it was clearly prohibited by reference to common standards of fairness, fair play and due process, and it was objectively and legally unreasonable in light of the legal rules clearly established at the time of the conduct.

376. Defendants stand personally liable to Santos pursuant to 42 U.S.C. § 1983 based upon their personal involvement and direct participation in the unconstitutional course of conduct concerning Santos complained of herein while acting under color of law and under pretense of law.

377. Defendants' conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

378. The public interest has been harmed by the Defendants' unlawful actions against Santos.

379. As a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendants stand jointly and severally liable to Plaintiff for the damages more fully alleged in paragraphs 283-286 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff HECTOR L. MAYSONET SANTOS prays that this Honorable Court grant him the following relief:

1. An order directing Defendant District to place Plaintiff in the position Plaintiff would have occupied but for Defendants' unlawful treatment of Plaintiff, and make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful treatment, including, but not limited to, lost wages and employment benefits, including an order requiring that Defendant reinstate Plaintiff to an appropriate position without further violation of his rights or retaliation, or, in the alternative, an award of front pay;

2. A finding that the Defendants stand jointly and severally liable to make Plaintiff whole for all damages suffered as a result of the wrongful acts and omissions alleged in each Count herein, including inter alia damages for personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, extreme and severe emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a damage to his professional and personal reputations, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses;

3. A finding that the Defendants stand jointly and severally liable to Plaintiff for the imposition of statutory exemplary or punitive damages, because Defendants intentionally and maliciously and without justification or excuse illegally discriminated against Plaintiff on the basis of his religion and national origin and retaliated against him for engaging in protected speech, thereby demonstrating Defendants' reckless and callous indifference to Plaintiff's constitutional rights and his right to work in an environment free from unlawful discrimination, and demonstrating Defendants' malice or ill will;

4. An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities, including the removal of the notice of intent to dismiss and all related discipline from Plaintiff's personnel file;
5. A finding that the doctrine of qualified immunity is inapplicable to Defendants Morris, Slaughter, and Sadiq and that they are personally liable to Santos;

6. A finding that Defendants stand jointly and severally liable to Plaintiff for an award of his reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-trial hearing to determine the amount of Plaintiff's reasonable attorneys' fees taxable to Defendants, along with a determination of Plaintiff's litigation costs and expenses taxable to Defendants;

7. An appropriate award of pre-judgment interest at the state rate of twelve percent (12%) per annum on all sums recovered; and

8. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff claims trial by jury on all issues so triable.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this **24**th day of November, 2026.

DocuSigned by:
Hector Santos
FB0C322EC4DD4DE...
HECTOR L. MAYSONET SANTOS

Respectfully Submitted by:

Plaintiff
HECTOR L. MAYSONET SANTOS
By and Through His Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (MA BBO#657622)

LAW OFFICE OF MARK P. GAGLIARDI
56 Pine Street, Suite 200
Providence, RI 02903
(401) 277-2030 (office)
(401) 274-2780 (fax)
(401) 487-6666 (cell)
mark@markgagliardilaw.net

Date: November 24, 2026